UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
STREAMLIGHT, INC.,

                                Plaintiff,               **REPORT AND
RECOMMENDATION**

           -against-                               18-CV-987 (NG)


JACOB GINDI, BRIDGEWATER TECHNOLOGIES
LLC,and JOHN DOES 1 through 10,

                                Defendants.
-------------------------------------------------------------------x

**ROANNE L. MANN, CHIEF UNITED STATES MAGISTRATE JUDGE:**

        Plaintiff Streamlight, Inc. ("plaintiff" or "Streamlight") brings this action for trademark

infringement, trademark counterfeiting, false designation of origin, unfair competition, injury to

business reputation, and deceptive practices, seeking injunctive relief, a delivery-and-destruction

order, statutory damages, an accounting, and attorneys' fees and costs, pursuant to the Lanham

Act, 15 U.S.C. §§ 1114(1), 1125(a); the New York General Business Law, N.Y. Gen. Bus. Law

§§ 349, 360-1; and New York common law.   See Complaint (Feb. 14, 2018) ("Compl.") ¶¶ 40-

70, Electronic Case Filing ("ECF") Docket Entry ("DE") #1.   Plaintiff filed this suit on February

14, 2018, against Jacob Gindi ("Gindi") and Bridgewater Technologies LLC ("Bridgewater")

(together, "defendants").   See id. at 1.[1]   Having failed to answer or otherwise defend in this

case, defendants defaulted, as noted by the Clerk of the Court on March 26, 2018.   See Clerk's

Entry of Default (Mar. 26, 2018) ("Entry of Default"), DE #16.   Plaintiff subsequently moved

---

[1] Also named as defendants were "John Does 1 through 10," who were never identified or served.   See
Compl. at 1.

for default judgment under Rule 55(b)(2) of the Federal Rules of Civil Procedure.   <u>See</u> Motion

for Default Judgment (October 31, 2018), DE #27; <u>see also</u> Memorandum of Law in Support of

Motion for Default Judgment (Oct. 31, 2018) ("Pl. Mem."), DE #27-3.   On April 22, 2019, the

Honorable Nina Gershon referred plaintiff's motion to the undersigned magistrate judge for a

report and recommendation.   <u>See</u> Order (Apr. 22, 2019), DE #28.   In response to an order of

this Court, <u>see</u> Order (May 22, 2019) ("5/22/19 Order"), DE #29,[2]  plaintiff filed a supplemental

memorandum and related documents, <u>see</u> Plaintiff's Supplemental Memorandum of Law in

Support of Motion for Default Judgment ("Pl. Supp. Mem."), DE #32; <u>see also</u> Declaration of

Joseph A. Rillotta (June 7, 2019) ("Rillotta Decl."), DE #33; Exhibit A to Rillotta Decl., DE #33-

1; Exhibit B to Rillotta Decl., #33-2.   Defendants did not respond.

      For the reasons set forth below, this Court respectfully recommends that plaintiff's

motion be granted in part and denied in part.   The Court concludes that plaintiff plausibly

alleges that defendants are liable for trademark infringement, trademark counterfeiting, unfair

competition and false designation of origin under the Lanham Act, as well as unfair competition

under New York common law.   The Court further concludes that plaintiff should be awarded

injunctive relief, a delivery-and-destruction order, and a portion of its requested statutory

damages and attorneys' fees and costs.   Plaintiff is not, however, entitled to an accounting.

---

[2] The Court's May 22, 2019 order required that plaintiff submit (1) an application for attorneys' fees, supported by contemporaneous time records; (2) legal authority for the requested delivery-and-destruction order; and (3) a more particularized description of the goods to be delivered for destruction.   <u>See</u> 5/22/19 Order.

## THE UNDERLYING FACTS

### I.   Plaintiff and its Trademarks

Plaintiff is a manufacturer and seller of flashlights and related accessories, and has sold various high-performance lighting tools since 1973.   See Compl. ¶ 10; Declaration of John C. Gregory, Jr. (Oct. 31, 2019) ("Gregory Decl.") ¶ 2, DE #27-2.   Streamlight describes itself as "an industry leader in developing flashlights and related lighting solutions featuring the latest technology as well as top-end performance, durability, and value."   Compl. ¶ 10.   Streamlight's strong commercial reputation had resulted in its products being used by fire departments, police departments, the military, and other agencies and individuals operating in potentially dangerous environments.   See id. ¶ 11.   Customer testimonials evidence Streamlight's strong commercial reputation.   Id. ¶ 12.   According to Streamlight company metrics, its flashlights are the most popular flashlight on Amazon, possessing the highest sales in its category.   See Gregory Decl. ¶ 14.

Plaintiff has registered with the United States Patent and Trademark Office (the "USPTO") various marks Ffeaturing the word STREAMLIGHT, including multiple stylized and word marks to identify its products.   See Compl. ¶ 13.   These registrations (collectively, "Streamlight Registrations") include:

> A.  Reg. No. 1479512 – STREAMLIGHT in International Class 11 for "flashlights and flashlight accessories, namely, flashlight recharges and flashlight holsters," registered March 8, 1988; first use in commerce September 1973.
>
> B.  Reg. No. 3004837 – STREAMLIGHT in International Class 11 for "flashlights and parts thereof and flashlight accessories, namely flashlight chargers and flashlight holsters," registered October 4, 2005; first use in commerce April 8, 2004.
>
> C.  Reg. No. 2926292 – STREAMLIGHT in International Class 11 for "flashlights and parts therefor and flashlight accessories," registered February 15, 2005; first use in commerce March 8, 2004.

3

D.  Reg. No. 3133462 –  in International Class 11 for "flashlights and parts thereof and flashlight accessories, namely flashlight chargers and flashlight holsters," August 22, 2006; first use in commerce June 2004.

E.  Reg. No. 3004836 – d  in International Class 11 for "flashlights and parts thereof and flashlight accessories, namely flashlight chargers and flashlight holsters," registered October 4, 2005; first use in commerce April 8, 2004.

F.  Reg. No. 4113018 – PROTAC in International Class 11 for "flashlights and parts therefor," registered March 13, 2012; first use in commerce May 21, 2010.

G.  Reg. No. 3415213 – MICROSTREAM in International Class 11 for "flashlights and parts therefor," registered April 22, 2008; first use in commerce May 10, 2007.

Id.; see Ex. B. to Rillotta Decl., DE #33-2.

Plaintiff has invested in the development and increased consumer recognition of Streamlight products, including spending a significant sum each year for the advertising and promotion of its flashlights.  See Compl. ¶ 18.  Two of the strongest selling flashlights produced by Streamlight are the STREAMLIGHT PROTAC 1L-1AA, a handheld battery-operated flashlight, and the STREAMLIGHT MICROSTREAM "mini LED" flashlight, which is a smaller pocket-sized light.  See id. ¶¶ 19-21.

## II.    Defendants and the Purported Infringement

In or around August 2017, Streamlight received complaints from purchasers of purported STREAMLIGHT MICROSTREAM flashlights.  See id. ¶ 22.  These purchasers complained that they had purchased on Amazon what they believed were STREAMLIGHT MICROSTREAM flashlights but had instead received counterfeits.  See id.  One Amazon customer wrote, in November 2017: "Did not receive what was pictured.  I believe it is a cheap imitation knock off," while another said that "[t]he flashlight I received in November 2017 does not match any of the photos at the top of the [A]mazon page . . . . I think I got a fake."  Ex. B (at p. 8) to Gregory Decl.  These lights had "a much weaker light beam" than the genuine

4

STREAMLIGHT MICROSTREAM flashlights.   See Compl. ¶¶ 23, 26.   Initially, customers received the non-STREAMLIGHT MICROSTREAM flashlights in white boxes displaying the Streamlight name and mark.   See id. ¶ 23.   Streamlight subsequently received additional complaints about other products purported to be STREAMLIGHT MICROSTREAM lights, purchased in similar packaging to genuine Streamlight products; the packaging incorporated and displayed several Streamlight marks and listed Streamlight's address and contact information. See id. ¶¶ 24-25.[3]   The infringing lights had "much weaker" light beams "as well as overall inferior product quality and construction," and were sold without a battery or lanyard.   See id. ¶ 26.

Streamlight also received complaints from purchasers of purported STREAMLIGHT PROTAC 1L-1AA flashlights, which were sold on Amazon in packaging similar to that of

---

[3] The Complaint includes photographs of the genuine and infringing products side-by-side, with the genuine Streamlight flashlight and package on the left of each image and a non-Streamlight light and package on the right:

 

See Compl. ¶¶ 24-25.

genuine Streamlight products.   See id. ¶¶ 27-28.[4]   These packages also displayed multiple

Streamlight marks and its address.   See id.   These lights had identical quality problems and,

unlike the authentic STREAMLIGHT PROTAC 1L-1AA, were sold without batteries.   See id.

¶ 29.   One Amazon reviewer who purchased two counterfeit STREAMLIGHT PROTAC 1L-

1AA flashlights wrote, in December 2017, that "I hate the flashlights I received from Amazon

because they were counterfeits.   I received two counterfeit Streamlight 1L-1AA flashlights from

Amazon . . . and didn't realize [the first] was a counterfeit but returned it for an exchange

because the tap-ten programming feature didn't work. . . ."   Ex. A (at p. 8) to Gregory Decl.

Upon learning of these complaints, Streamlight engaged in a series of "controlled buys"

to identify additional non-Streamlight flashlights that displayed its marks and that were available

on Amazon in direct competition with Streamlight flashlights.   See Compl. ¶ 30.   After

Streamlight notified Amazon of the purported counterfeits and demanded it cease and desist its

purchase and sale of these goods, Amazon identified to Streamlight the seller for each item that

Streamlight identified as a counterfeit.   See id. ¶¶ 31-32.   "For most of the transactions

identified by Streamlight, and for all of these transactions where Amazon itself purchased

---

[4] See Compl. ¶¶ 27-28 (displaying a genuine Streamlight light and package on the left of each image and a non-Streamlight light and package on the right):



flashlights for resale (as opposed to merely fulfilling transactions through its 'third-party marketplace'), Amazon identified the seller as 'Jack Gindi d.b.a Bridgewater Technologies, LLC.'"   Id. ¶ 32.   According to records of the New York State Department of State, Bridgewater was formed on June 5, 2017 – approximately two months prior to the first counterfeit transactions referenced in plaintiff's Complaint.   See id. ¶ 33.   The seller's address, as provided by Bridgewater to Amazon, is a Brooklyn location that appears to be a residence owned by members of Jack Gindi's family, see id. at ¶ 34, but the product shipped from an Ocean Township address of what appears to be a shuttered retail establishment, see id. ¶ 35. The latter property, and an adjacent warehouse, are owned by a New Jersey company, 920 Highway 35 LLC, with its registered agent listed as Michael Betesh, a relative or associate of defendant Gindi.   See id. ¶ 36.

Upon learning of defendants' identities from Amazon, Streamlight contacted defendants, who agreed to "provide certain information for concessions from Streamlight."   Gregory Decl. ¶ 11.[5]   Defendants subsequently provided Streamlight with a limited set of documents showing defendants' purchases and sales of counterfeit MICROSTREAM and PROTAC 1L-1AA products.   See id.   These documents purport to show that defendants purchased at least 4,850 counterfeit PROTAC 1L-1AA units, paying $9.00 per unit, for a total of $43,650, and purchased 11,450 MICROSTREAM units, paying between $3.45 and $3.75 per unit, for a total of approximately $41,197.50.   See id. ¶ 12.   Defendants later sold their inventory of PROTAC flashlights to Amazon for $29.93 per unit, and MICROSTREAM lights to Amazon for $11.50 per unit.   See id.   Thereafter, defendants informed Streamlight that the "amount outstanding from Amazon" is $266,613.27.   See id.

---

[5] Plaintiff has not identified the demanded concessions.

Streamlight maintains that "[d]efendants continue to market and sell the Counterfeit [Streamlight] Goods in the United States and elsewhere."  Compl. ¶ 38.

## DEFAULT JUDGMENT STANDARD

Where the "plaintiff's claim is [not] for a sum certain[,]" a plaintiff seeking default judgment against a defendant who failed to answer or otherwise defend the case "must apply to the court" after "the clerk enter[s] the [defendant's] default."  Fed. R. Civ. P. 55(a)-(b).  A defendant's "default is deemed to constitute a concession of all well pleaded allegations of liability[.]"  Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992).  Nevertheless, the court need not "agree that the alleged facts constitute a valid cause of action," TAGC Mgmt., LLC v. Lehman, Lee & Xu Ltd., 536 F.App'x 45, 46 (2d Cir. 2013) (internal quotation marks and citations omitted), and, "before [entering] a default judgment, it must determine whether the allegations in a complaint establish the defendant's liability as a matter of law[,]" Taizhou Zhongneng Imp. & Exp. Co., Ltd v. Koutsobinas, 509 F.App'x 54, 56 (2d Cir. 2013) (citing Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009)).  To the extent that the plaintiff's allegations are inadequate, "a district court has discretion under Rule 55(b)(2) . . . to require proof of necessary facts" to satisfy itself that there is "a valid cause of action[.]" Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981); accord Finkel, 577 F.3d at 87.

"When deciding a [defendant's liability on a] motion for default judgment, courts have . . . looked to recent precedent with regard to surviving a Rule 12(b)(6) motion to dismiss[.]" Chanel, Inc. v. Louis, No. 06-cv-5924 (ARR)(JO), 2009 WL 4639674, at *3 (E.D.N.Y. Dec. 7, 2009).  On a Rule 12(b)(6) motion, courts follow a two-prong approach.  See Ashcroft v. Iqbal, 556 U.S. 662, 677-80 (2009).  First, the complaint's conclusions of law and formulaic recitations of elements of a cause of action should be disregarded.  See id.  Second, where the

8

complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679. A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007)). While "[t]he plausibility standard is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 556). For mixed questions of law and fact, the inquiry is whether the plaintiff sufficiently alleged underlying facts to plausibly support its conclusions of law. See, e.g., Cintas Corp. v. Unite Here, 355 F.App'x 508, 510 (2d Cir. 2009). The Supreme Court has invited courts, in assessing the sufficiency of pleadings, to use their "judicial experience and common sense." Iqbal, 556 U.S. at 679.

Although, in deciding motions for default judgment, courts assume the truth of the pleadings' well-pled facts as they relate to liability, the facts alleged in the pleadings are not assumed to be true in assessing plaintiffs' right to the relief requested. See Au Bon Pain, 653 F.2d at 65. In other words, even if a defendant is found to be liable, the defendant's default is not considered an admission of the plaintiff's entitlement to an award of damages or equitable relief. See Greyhound Exhibitgroup, 973 F.2d at 158; SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 814 (2d Cir. 1975). Instead, the relief requested must "be established by the plaintiff" with evidence, Greyhound Exhibitgroup, 973 F.2d at 158, and may not exceed "what is specified in the [complaint's] 'demand for judgment,'" Silge v. Merz, 510 F.3d 157, 160 (2d Cir. 2007). In this regard, a court may rely on "detailed affidavits and documentary evidence" and need not conduct an evidentiary hearing on the appropriateness of the relief requested. See Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 39-40 (2d Cir. 1989).

9

## DISCUSSION

I.    **Defendants' Liability Under the Lanham Act**[6]

    A.    **Plaintiff's Claims for Trademark Infringement and Trademark Counterfeiting Under Section 32 the Lanham Act**

Plaintiff, in its Complaint, asserts a claim (Count I) for trademark infringement under Section 32(1) of the Lanham Act, 15. U.S.C. § 1114(1)(a).   See Compl. ¶¶ 40-47; Pl. Mem. at 7 n.1.   Plaintiff likewise asserts a trademark counterfeiting claim (Count II) under Sections 32, 34, and 35 of the Lanham Act, 15. U.S.C. §§ 1114(1)(b), 1116(d), and 1117(b)-(c), see Compl. ¶¶ 48-53; Pl. Mem. at 7 n.1.[7]   Although plaintiff's Complaint lists separate counts for trademark infringement and for trademark counterfeiting, see Compl. ¶¶ 40-53, both are predicated upon Section 32 of the Lanham Act, 15 U.S.C. § 1114(a), and therefore, one analysis is appropriate in evaluating both claims, see generally Yahoo! Inc. v. XYZ Cos., 872 F.Supp.2d 300, 304 (S.D.N.Y. 2011).

With respect to plaintiff's trademark infringement claim, Section 32(1)(a) imposes civil liability on any person who, without the consent of the registrant,

---

[6] Streamlight requests that the Court issue an order granting "default judgment as to its claims of trademark infringement under Section 32(1) of the Lanham Act [Count I], trademark counterfeiting [Count II], unfair competition and false designation of origin under Section 43(a) [Count III], and common law unfair competition [Count IV]."   Pl. Mem. at 7 n.1.   Streamlight expressly declines to seek default judgment as to its claim under Section 360-1 of New York's General Business Law (Count V), see id., and its motion papers make no mention of its deceptive practices claim under Section 349 of that New York statute (Count VI).   As "trademark infringement claims generally are not cognizable under New York Business Law," see Ideavillage Prods. Corp. v. Bling Boutique Store, 16-CV-9039 (KMW), 2018 WL 3559085, at *3 (S.D.N.Y. July 24, 2018), this Court assumes plaintiff is not seeking default judgment with respect to the Section 349 claim.

[7] Sections 34 and 35 of the Lanham Act – 15 U.S.C. §§ 1116(d) and 1117(b)-(c) – do not create separate causes of action; instead, these provisions deal with the relief available to plaintiffs who bring claims under 15 U.S.C. § 1114(1)(a).   See generally Lyons P'ship L.P. v. D & L Amusement & Entm't, Inc., 702 F.Supp.2d 104, 114 (E.D.N.Y.) (noting that 15 U.S.C. § 1116 does not provide an independent cause of action for trademark violations); 15 U.S.C. § 1117(b) (titled "[t]reble damages for use of counterfeit mark"); 15 U.S.C. § 1117(c) (titled "statutory damages for use of counterfeit marks").

use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . .

15 U.S.C. § 1114(1)(a).   With respect to plaintiff's trademark counterfeiting claim, Section

32(1)(b) imposes civil liability on any person who, without authorization,

reproduce[s], counterfeit[s], cop[ies], or colorably imitate[s] a registered mark and appl[ies] such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . .

15 U.S.C. § 1114(1)(b).

To establish a defendant's liability for either trademark infringement or trademark counterfeiting under Section 32(1), a plaintiff must show that (1) it has a valid mark that is entitled to protection under the Lanham Act, and (2) defendants' (unauthorized) actions are likely to cause confusion as to the origin of the mark.   See generally Brennan's, Inc. v. Brennan's Rest., L.L.C., 360 F.3d 125, 129-30 (2d Cir. 2004) (applying the two-prong "Gruner test" described in Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072 (2d Cir. 1993)); Philip Morris USA Inc. v. Felizardo, No. 03 Civ. 5891(HB), 2004 WL 1375277, at *4 (S.D.N.Y. June 18, 2004).

Here, the Complaint's well-pled and uncontested allegations plausibly allege that defendants are liable for trademark infringement and trademark counterfeiting.   First, plaintiff alleges, see Compl. ¶¶ 13-14, and has proffered supporting exhibits, see Ex. B to Rillotta Decl., that it successfully registered, with the USPTO, the Streamlight mark and multiple other marks identifying Streamlight products, including the STREAMLIGHT MICROSTREAM and PROTAC 1L-1AA flashlights.   See Guthrie Healthcare Sys. v. ContextMedia, Inc., 826 F.3d 27,

11

37 (2d Cir. 2016) (noting that the registration of a mark with the USPTO creates a presumption of the registrant's ownership of a valid mark).

Second, plaintiff pleads facts and proffers evidence supporting the plausibility that defendants' conduct is likely to cause confusion as to the origin of the mark.   When assessing the likelihood of confusion, courts in the Second Circuit consider eight non-exhaustive factors (referred to as the *Polaroid* Factors):

(1) the strength of the plaintiff's trademark;

(2) the similarity of the parties' marks;

(3) the proximity of the parties' products in the marketplace;

(4) the likelihood that the plaintiff will "bridge the gap" between the products;

(5) actual consumer confusion between the two marks;

(6) the defendant's intent in adopting its mark;

(7) the quality of the defendant's product; and

(8) the sophistication of the relevant consumer group.

Playtex Prods., Inc. v. Georgia Pacific Corp., 390 F.3d 158, 162 (2d Cir. 2004) (citation omitted) (Sotomayor, J.), superseded by statute on other grounds as recognized in Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 107 (2d Cir. 2009).   Six of the aforementioned factors relate directly to consumer confusion (Factors (1)-(5), (8)).   See Virgin Enters. Ltd. v. Nawab, 335 F.3d 141, 147 (2d Cir. 2003).   "However, in cases involving counterfeit marks, it is unnecessary to perform the step-by-step examination of each *Polaroid* factor because counterfeit marks are inherently confusing."   Philip Morris, 2004 WL 1375277, at *5 (citing Gucci Am., Inc. v. Duty Free Apparel, Ltd., 286 F.Supp.2d 284, 287 (S.D.N.Y. 2003)); see also Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir. 1987) ("Where, as here, one produces counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product, there is a presumption of a likelihood of confusion.") (citation omitted).

Here, per the Complaint, defendants, without permission from plaintiff, distributed non-Streamlight flashlights to Amazon to sell these products to consumers.  See generally Compl. ¶¶ 22-28.  The products and packaging that defendants provided to Amazon for sale bore the Streamlight name and/or mark.  See id.  These non-Streamlight products appeared to be replicas of Streamlight products, as the flashlights, marks, and packaging were nearly identical to their authentic Streamlight counterparts.  See id.  For example, as discussed above, with respect to the packaging of STREAMLIGHT MICROSTREAM lights, these products were, at first, delivered to purchasers in white boxes bearing the Streamlight name and mark.  Id. ¶ 23. Subsequent non-Streamlight MICROSTREAM flashlights appeared in clear packaging that looked almost identical to that of genuine Streamlight products.  See id. ¶ 24.  This packaging included multiple Streamlight marks, as well as Streamlight's address and contact information. See id. ¶ 25.  Beginning in or around August 2017, Streamlight began fielding complaints from purchasers using Amazon who indicated they had believed they were buying Streamlight products (either the MICROSTREAM or PROTAC 1L-1AA lights) but had discovered that the lights delivered to them were not, in fact, authentic.  See Gregory Decl. ¶¶ 7-8.  Multiple Amazon product reviews reflect buyers who purchased counterfeit Streamlight flashlight lights mistaking them to be authentic.  See Ex. A (at p. 8) to Gregory Decl. (displaying customer reviews for the PROTAC 1L-1AA); see also Ex. B. (at pp. 8-9) to Gregory Decl. (displaying customer reviews for the MICROSTREAM).

Because counterfeits, by their nature, cause confusion, see Gucci Am., 286 F.Supp.2d at 287, and because the facts alleged show that the appearance of the non-Streamlight flashlights and packaging was nearly identical to that of the Streamlight products, the pleading plausibly supports a strong likelihood of consumer confusion.  The second prong under the Lanham Act is

therefore satisfied.   Further, if the Court were to perform a *Polaroid* analysis, Streamlight would

succeed in demonstrating both consumer confusion due to the national recognition of the

Streamlight marks, see Compl. ¶ 11, and defendants' deliberate usage of identical marks to sell

lights that appear to have been purposefully designed to be indistinguishable from Streamlight's

MICROSTREAM and PROTAC 1L-1AA products, see generally Spin Master Ltd. v. Alan

Yuan's Store, 325 F.Supp.3d 413, 422 (S.D.N.Y. 2018).   Therefore, plaintiff has demonstrated

defendants' liability for trademark infringement and trademark counterfeiting under the Lanham

Act.

**B.  Plaintiff's Claim for False Designation of Origin and Unfair Competition Under Section 43 of the Lanham Act**

Plaintiff additionally asserts a claim (Count III) for unfair competition and false

designation of origin under Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1).   See

Compl. ¶¶ 54-59; Pl. Mem. at 7 n.1.   Section 43(a)(1) prohibits the use in commerce of "any

word, term, name, symbol, or device, . . . or any false designation of origin, false or misleading

description of fact, or false or misleading representation of fact," that is likely to cause

"confusion or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval" of

goods or services.   15 U.S.C. § 1125(a)(1).   Congress, in enacting the statute, intended to

"prevent consumer confusion regarding a product's source and to enable those that fashion a

product to differentiate it from others on the market."   Capital One Fin. Corp. v. Capital One

Certified Inc., 18 CV 580 (ARR) (RML), 2019 WL 1299266, at *4 (E.D.N.Y. Mar. 5, 2019)

(citation omitted), adopted, 2019 WL 1299661 (E.D.N.Y. Mar. 21, 2019).   False designation of

origin and unfair competition claims are similar to trademark infringement claims, except that

14

Section 43(a)(1) broadly applies to unregistered as well as registered trademarks.   See Lyons P'ship L.P. v. D & L Amusement & Entm't, Inc., 702 F.Supp.2d 104, 113 (E.D.N.Y. 2010).

Courts in the Second Circuit have determined that "[t]he standards for false designation of origin claims under Section 43(a) of the Lanham Act (15 U.S.C. § 1125) are the same as for trademark infringement under Section 32 (15 U.S.C. § 1114)."   Sola Franchise Corp. v. Solo Salon Studios Inc., No. 14-CV-0946(JS)(AKT), 2015 WL 1299259, at *7 (E.D.N.Y. Mar. 23, 2015) (citation omitted).   Likewise, the standard for an unfair competition claim under Section 43(a) is identical to that of a trademark infringement claim pursuant to Section 32 of the Lanham Act.   See Capital One, 2019 WL 1299266, at *4; Richemont N. Am., Inc. v. Huang, No. 12 Civ. 4443(KBF), 2013 WL 5345814, at *5 n.15 (S.D.N.Y. Sept. 24, 2013).

Plaintiff has, in its well-pleaded Complaint, satisfied the elements of its trademark infringement and trademark counterfeiting claims under Section 32(a) of the Lanham Act (15 U.S.C. § 1114(a)), and therefore, has also sufficiently stated its false designation of origin and unfair competition claim under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)).

## II.    Defendants' Liability for Unfair Competition Under New York Common Law

Plaintiff has also alleged a claim for unfair competition under New York common law (Count IV).   See Compl. ¶¶ 60-64; Pl. Mem. at 7 n.1.   "The standards for unfair competition claims under . . . New York law are the same as those governing trademark infringement claims under the Lanham Act, except the common law [unfair competition claim] requires a showing of bad faith or intent."   Turn On Prods., Inc. v. Almost Famous Apparel, LLC, No. 18-CV-00625 (ILG) (RER), 2019 WL 2436297, at *3 (E.D.N.Y. Apr. 12, 2019) (citation and internal quotations omitted); see Genesee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137, 149 (2d Cir. 1997).

Plaintiff in this case has made the requisite showing of bad faith.   "Under New York law, a presumption of bad faith attaches to the use of a counterfeit mark."   Spin Master, 325 F.Supp.3d at 424; see also Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp., 689 F.Supp.2d 585, 599 (S.D.N.Y. 2010).   Further, as is described in the Complaint, defendants sold non-Streamlight flashlights with almost-identical packaging designs, see Compl. ¶¶ 24-25, 27-28, and included the Streamlight name and address on its packaging so as to pass off the counterfeit products as genuine ones, see id. ¶¶ 25, 28.   These allegations of deliberate counterfeiting of Streamlight's MICROSTREAM and PROTAC 1L-1AA flashlights, and the close-to-identical packaging of the Streamlight and non-Streamlight products, support the inference of defendants' bad faith.

As there has been a showing of bad faith, coupled with defendants' liability for trademark infringement and trademark counterfeiting under the Lanham Act, defendants in this case are also liable for unfair competition under New York common law, as alleged in Count IV.

## III.    Plaintiff's Request for a Permanent Injunction[8]

Streamlight seeks permanent injunctive relief against defendants, as is permitted under federal trademark laws.   See Pl. Mem. at 9-12.   First, plaintiff seeks a nationwide injunction enjoining defendants "from offering any goods or services under a mark consisting of, or substantially similar to, Streamlight's name and marks, including but not limited to the marks identified by the Streamlight Registrations . . . , alone or in combination with any other term, symbol, or design, pursuant to 15 U.S.C. § 1116."   Compl., ad damnum clause ¶ 1; Plaintiff's

---

[8] As a preliminary matter, it bears repeating that, while well-pled allegations pertaining to liability are deemed admitted on a motion for default judgment, allegations concerning damages and other forms of relief are not; rather, the plaintiff must proffer evidence to establish its entitlement to the relief requested. See supra, p. 9.

16

Proposed Order ("Prop. Ord.") ¶ 2(a), DE #27-1.   Second, plaintiff further seeks to permanently enjoin defendants from "committing any other act that is likely to cause confusion, mistake, or deception pursuant to 15 U.S.C. § 1116 in connection with Streamlight, Streamlight's marks, or Streamlight's goods and services."   Prop. Ord. ¶ 2(b).

Under the Lanham Act, a court may award injunctive relief "according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of . . . [the Act]."   15 U.S.C. § 1116(a).   Although courts enjoy broad discretion in determining whether to grant a permanent injunction or similar equitable relief for trademark infringement, see 15 U.S.C. §§ 1116, 1118, 1119; Beastie Boys v. Monster Energy Co., 87 F.Supp.3d 672, 680 (S.D.N.Y. 2015) (citing Patsy's Italian Rest., Inc. v. Banas, 658 F.3d 254, 272 (2d Cir. 2011)), their discretion is constrained by four prerequisites to such relief, see eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).   Specifically, a plaintiff must succeed on the merits and demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of the hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." Id. (collecting cases).

In eBay, a patent case in which the jury had found the defendant liable for infringement, the Supreme Court held that courts may not grant permanent injunctions merely because the plaintiff succeeds in proving a defendant's liability; the plaintiff must additionally satisfy the above four equitable factors.   See id. at 393-94.   The Court rejected the use of categorical rules or presumptions in performing this equitable analysis, see id. at 393, and subsequently reiterated these principles in the context of a motion for preliminary injunction in an environmental law

case, see Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20-24 (2008). Thereafter, in Salinger v. Colting, the Second Circuit clearly signaled that the *eBay* standard is not limited to patent cases: the Court noted in dicta that "we see no reason that *eBay* would not apply with equal force to an injunction in *any* type of case[,]" and cautioned lower courts to eschew general rules or presumptions in assessing requests for injunctive relief.   See 607 F.3d 68, 78 n.7 (2d Cir. 2010) (emphasis in original).

Although the Second Circuit has yet to expressly decide whether the *eBay* standard extends to trademark infringement cases, see U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 511 F.App'x 81, 85 (2d Cir. 2013), district courts in this Circuit have generally followed *Salinger's* lead, reasoning that "there appears to be no principled reason not to adopt the newly announced standard in the trademark context[,]" U.S. Polo Ass'n Inc. v. PRL USA Holdings, Inc., 800 F.Supp.2d 515, 539 (S.D.N.Y. 2011) (collecting cases), aff'd, 511 F.App'x 81 (2d Cir. 2013); accord Sola Franchise, 2015 WL 1299259, at *16; Balady v. Elhindi, No. 14 CV 855 (SJ)(RER), 2014 WL 7342867, at *11 (E.D.N.Y. Dec. 23, 2014).   Accordingly, even in the context of a motion for default judgment, a plaintiff seeking an injunction in a trademark infringement action must make the requisite showing on each of the four *eBay* factors.   See Kohler Co. v. Bold Int'l FZCO, 17-cv-4233 (LDH) (RLM), 2018 WL 4804655, at *8 (E.D.N.Y. Oct. 4, 2018); Am. Auto. Ass'n, Inc. v. Limage, 15-CV-7386 (NGG) (MDG), 2016 WL 4508337, at *6 (E.D.N.Y. Aug. 26, 2016).

### A.  Irreparable Injury

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."   Rodriguez *ex rel.* Rodriguez v. DuBuono, 175 F.3d 227, 233-34 (2d Cir. 1999). (citation and internal quotation marks omitted).   Traditionally, "courts must not

18

simply presume irreparable harm . . . [instead, a plaintiff must show that] the failure to issue a[ ] [preliminary] injunction would actually cause irreparable harm." Deckers Outdoor Corp. v. Huang, No. 1:15-CV-04772 (AMD)(RER), 2017 WL 1842556, at *6 (E.D.N.Y. Apr. 20, 2017) (citation omitted).   In trademark infringement cases under the Lanham Act, a party may show irreparable injury by demonstrating a likelihood of confusion.   See Prot. One Alarm Monitoring, Inc. v. Exec. Prot. One Sec. Serv., LLC, 553 F.Supp.2d 201, 206 (E.D.N.Y. 2008); see also Lobo Enters., v. Tunnel, Inc., 822 F.2d 331, 333 (2d Cir. 1987) ("[I]rreparable injury is established where there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.") (citation and internal quotation marks omitted).   In counterfeit cases, such as this one, counterfeit products, "by their very nature, cause confusion."   See Gucci Am., 286 F.Supp.2d at 287 (citation omitted).   As this Court has already determined that defendants' counterfeit items are substantially similar to Streamlight flashlights such that they caused consumer confusion, see supra, Part II, Streamlight has suffered an irreparable injury.   See Moose Toys Pty LTD v. Thriftway Hylan Blvd. Drug Corp., No. 15-CV-4483 (DLI)(MDG), 2015 WL 4772173, at *3 (E.D.N.Y. Aug. 6, 2015) ("Having demonstrated a likelihood of confusion, Plaintiffs establish both a likelihood of success on the merits and irreparable harm.").[9]

### B.  Inadequate Legal Remedies

With respect to the second *eBay* factor, Streamlight has shown that the other available legal remedies are inadequate.   Through its default, defendants admit to the allegations outlined

---

[9] Additionally, defendants' "threat of continuing violations," as demonstrated by their default, qualifies as irreparable harm under the *eBay* standard.   See Ideavillage Prods. Corp. v. Bling Boutique Store, No. 16-CV-9039 (KMW), 2018 WL 3559085, at *4 (S.D.N.Y. July 24, 2018) (" . . . Defaulting Defendants' refusal to defend this action creates a threat that they will continue to infringe . . . unless permanently enjoined from doing so.").

in Streamlight's well-pleaded Complaint, including that "[d]efendants continue to market and sell the Counterfeit Goods in the United States and elsewhere."  Compl. ¶ 38.  Defendants' continuing use of the infringing mark will cause further loss to Streamlight's reputation, a loss that is neither easily calculable nor precisely compensable.  See Marks Org., Inc. v. Joles, 784 F.Supp.2d 322, 335 (S.D.N.Y. 2011) ("Loss of good will is particularly hard to quantify because monetary damages do not redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come.") (citation and internal quotation marks omitted).  "The difficulty in detecting and measuring the extent of Defendants' violations and potential future violations suggests that an injunction is necessary to ensure an effective remedy in this case."  Chanel, Inc. v. Gordashevsky, Civ. No. 05-5270 (RBK), 2007 WL 316433, at *8 (D.N.J. Jan. 29, 2007).

Additionally, "[a] court may infer from a defendant's default that it is willing to, or may continue its infringement."  Pearson Educ., Inc. v. Vergara, No. 09 Civ. 6832(JGK)(KNF), 2010 WL 3744033, at *4 (S.D.N.Y. Sept. 27, 2010).  Because Streamlight is threatened with the continued loss of goodwill and harm to its business reputation, and due to defendants' default, legal remedies alone are inadequate to protect plaintiff, thus entitling it to injunctive relief.

## C.  Balance of the Hardships and the Public's Interest

The balance of the hardships weighs strongly in favor of Streamlight and against defendants.  Streamlight's Complaint states that Streamlight has spent significant time and money generating the good will and reputation for quality associated with its flashlights.  See Compl. ¶¶ 10-12.  In contrast, defendants, by defaulting, have not alleged any hardship whatsoever.

20

With respect to *eBay*'s public interest factor, as applied to trademark infringement and trademark counterfeit cases, "the public has an interest in not being deceived – in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality."  Diesel S.P.A. v. Does, 14-CV-4592 (KMW), 2016 WL 96171, at *10 (S.D.N.Y. Jan. 8, 2016) (citation omitted).   As Streamlight has demonstrated a likelihood of consumer confusion with respect to the MICROSTREAM and PROTAC 1L-1AA flashlights, the public interest weighs in favor of the granting of a permanent injunction.   Accordingly, it is the recommendation of this Court that defendants and each of their owners, affiliates, partners, subsidiaries, associates, directors, officers, agents, servants, employees, successors, assigns, owners, and all others under their control or acting in concert with them or having knowledge thereof, be permanently enjoined from (1) offering goods or services under a mark consisting of, or substantially similar to, marks identified by the Streamlight Registrations; and (2) committing any other act likely to cause confusion, mistake, or deception pursuant to 15 U.S.C. § 1116 in connection with Streamlight, its marks, or its goods and services.

## IV.    Plaintiff's Request for the Delivery and Destruction of Infringing Materials

In addition to plaintiff's request that defendants be permanently enjoined from infringing Streamlight trademarks, plaintiff also asks the Court to (1) order "Defendants to deliver to Streamlight for destruction all counterfeit Streamlight products," Pl. Supp. Mem. at 2, and (2) order that "Defendants . . . deliver up to Plaintiff for destruction all products, packaging, labels, signs, promotional materials, advertisements, and other communications to the public in [their] possession or [their] control bearing any material or representations that are or may be false or misleading as to Streamlight's association with Defendants in any way or infringe Streamlight's copyright and trademark rights . . . ."   Prop. Ord. ¶ 4.

Where, as here, a defendant is determined to have violated 15 U.S.C. § 1125(a) by engaging in false designation of origin, Section 36 of the Lanham Act (15 U.S.C. § 1118) permits the court to order the delivery and destruction of infringing goods.   See generally Hilton v. Int'l Perfume Palace, Inc., No. 12-CV-5074 (JFB)(GRB), 2013 WL 5676582, at *14 (E.D.N.Y. Oct. 17, 2013) (Bianco, J.).   As discussed above, Streamlight has established defendants' violation of 15 U.S.C. § 1125(a).[10]

Whether to order the deliverance and destruction of counterfeit goods is a decision within the district court's discretion.   See Hilton, 2013 WL 5676582, at *14.   Some courts in this Circuit have refused to issue an order for the delivery and destruction of the infringer's goods because the issuance of a permanent injunction barring defendant from continuing to infringe is deemed to be sufficient, see Fendi Adele S.R.L. v. Filene's Basement, Inc., 696 F.Supp.2d 368, 392 (S.D.N.Y. 2010), while others recognize that awarding forfeiture and destruction, although discretionary, is particularly appropriate where a court is seeking to prevent future infringements, see Sanrio Co., Ltd. v. Teng Fei Trading Inc., CV 04-5430 (BMC)(MDG), 2007 WL 9718371, at *6 (E.D.N.Y. Sept. 4, 2007), adopted, 2008 WL 11429612 (E.D.N.Y. Sept. 27, 2008); see also Hilton, 2013 WL 5676582, at *14.   Given defendants' default, this Court concludes that a delivery-and-destruction order is appropriate, as it remains possible that defendants are currently selling, or will in the future sell, any remaining counterfeit merchandise in their possession, regardless of the issuance of a permanent injunction.   See Balady, 2014 WL 7342867, at *14 (issuing a delivery-and-destruction order and noting that, "on default judgment, the court cannot

---

[10] Another provision of the Lanham Act, 15 U.S.C. § 1116(d)(1)(a), authorizes the issuance of an order for the seizure of counterfeit goods.   See Jab Distribs., LLC v. Home Linen Collections, 14-CV-6859 (MKB) (CLP), 2016 WL 1255729, at *4 (E.D.N.Y. Mar. 30, 2016).   Although Streamlight, in its Complaint, seeks a seizure order, see Compl., ad damnum clause ¶ 3, neither plaintiff's motion papers for default judgment nor its proposed order seek a seizure order.

adequately determine the extent to which destruction may be necessary, or that the defendant will comply with the injunction") (citation omitted); see generally Compl. ¶ 38.

Accordingly, this Court respectfully recommends that defendants be ordered to deliver to Streamlight, for destruction, (1) all infringing products and (2) all other products, packaging, labels, signs, promotional materials, advertisements, and other communications to the public in their possession or under their control bearing any material or representations that are or may be false or misleading as to Streamlight's association with defendants.   However, to the extent that Streamlight also requests a seizure order, see Compl., ad damnum clause ¶ 3, this Court recommends this request be denied, as such relief is not available as a remedy under 15 U.S.C. § 1118.   See generally Jab Distribs., 2016 WL 1255729, at *5.

## V.    Plaintiff's Request for Statutory Damages

The Lanham Act permits the recovery of actual or statutory damages.   See 15 U.S.C. § 1117(a), (c).   Streamlight, in its papers, limits its request for monetary relief to statutory damages.[11]   See Pl. Mem. at 12.   The Lanham Act provides, in pertinent part, for an award of statutory damages in the amount of:

---

[11] Congress enacted the statutory damages provision of the Lanham Act in recognition of the extreme difficulties of proving actual damages in counterfeiting cases.   See Louis Vuitton Maltier, S.A. v. LY USA, No. 06 Civ. 13463(AKH), 2008 WL 5637161, at *1 (S.D.N.Y. Oct. 3, 2008).   Streamlight seeks statutory damages rather than actual damages because, "[a]s a result of Defendants' default, Streamlight has been unable to conduct fulsome discovery to ascertain the extent of actual damages caused by Defendants' counterfeiting activities or the extent of profits earned by Defendants that would warrant disgorgement, see generally 15 U.S.C. § 1117(a), which damages or profits would otherwise be trebled pursuant to 15 U.S.C. § 1117(a)."   Pl. Mem. at 12; see also Polo Ralph Lauren, L.P. v. 3M Trading Co., Inc., No. 97 Civ. 4824 (JSM) (MH), 1999 WL 33740332, at *4 (S.D.N.Y. Apr. 19, 1999) (holding that statutory damages are appropriate where "defendants . . . declined to participate in this lawsuit . . . and thus deprived plaintiffs of the opportunity to make a meaningful assessment of the extent of their business, including volume of sales and profits earned") (citation omitted).

(1) not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or

(2) if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

15 U.S.C. § 1117.

For each of the seven registered marks that it claims were used by defendants, see Streamlight Registrations, plaintiff requests an award of $1,000,000, for an aggregate award of $7,000,000.   See Pl. Mem. at 12, 19; Prop. Ord. ¶ 6.   As defendants' default demonstrates willfulness, see Unilever Supply Chain, Inc. v. I & I Wholesale Food Inc., No. 10-CV-1077 (RJD)(RER), 2011 WL 1113491, at *2 (E.D.N.Y. Feb. 17, 2011), adopted, 2011 WL 1099841 (E.D.N.Y. Mar. 24, 2011), the Court has discretion under 15 U.S.C. § 1117(c)(2) to award damages of up to $2,000,000 per counterfeit mark.

The Lanham Act does not provide courts with guidelines for determining an appropriate statutory damages award.   See 15 U.S.C. § 1117(c).   Instead, "[i]n the default judgment context, a court has discretion to award a statutory damages amount that it feels is just under the circumstances."   Turn On Prods., 2019 WL 2436297, at *5 (citing cases); see also Rolls-Royce PLC v. Rolls-Royce USA, Inc., 688 F.Supp.2d 150, 156-57 (E.D.N.Y. 2011) (noting that courts are vested with "considerably broad discretion" in determining statutory damages under the Lanham Act).   When evaluating what constitutes a just award, Second Circuit courts look at the following seven factors:

(1) the expense saved and the profits reaped by defendant;
(2) the revenues lost by plaintiff;
(3) the value of the mark;
(4) the scale of defendant's infringement;
(5) whether defendant's conduct was innocent or willful;

24

(6)   whether defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and

(7) the potential for discouraging defendant and others.

7-Eleven, Inc. v. Z-Eleven Convenience Store Inc., 16-CV-4116-RRM-SJB, 2018 WL 1521859, at *6 (E.D.N.Y. Jan. 17, 2018) (citing Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co., 807 F.2d 1110, 1117 (2d Cir. 1986)), adopted, 2018 WL 1466799 (E.D.N.Y. Mar. 26, 2018).   When applied to the case at hand, these factors weigh significantly in support of an award of substantial statutory damages, albeit not to the extent that Streamlight demands.

## A. Expenses Saved and Profits Reaped by Defendants

The first *Fitzgerald* factor looks at the expenses saved and the profits reaped by the defendants.   Defendants' default denied plaintiff the ability to conduct comprehensive fact discovery.   Traditionally, in cases involving a default by an infringing party, courts are unable to assess profits, and thus, this factor is considered neutral.   See generally Spin Master, Inc. v. Amy & Benton Toys & Gifts Co., No. 17-CV-5845 (VSB), 2019 WL 464583, at *6 (S.D.N.Y. Feb. 6, 2019).   Plaintiff admits that it is impossible to determine with precision the expenses saved and profits reaped by defendants; however, "Streamlight is able to roughly approximate the scope of Defendants' counterfeiting and revenue based on a limited set of documents provided by Defendant Gindi."   Pl. Mem. at 14-15.   Plaintiff states that the documents disclosed by Gindi show that defendants sold at least 16,300 counterfeit MICROSTREAM and PROTAC 1L-1AA flashlights to Amazon, yielding revenue of $276,000, based upon defendants' estimated per-unit purchase price and defendants' per-unit sale price.   Id. at 15 (citing Gregory Decl. ¶ 12).[12]   While this number is an approximation due to the limited information provided to

---

[12] Defendants claim the "amount outstanding from Amazon" is $266,613.27.   Gregory Decl. ¶ 12.

Streamlight by defendant Gindi, this Court concludes that an award based on purely compensatory relief for defendants' ill-gotten gains would likely total close to $276,000. Therefore, this factor weighs in favor of a statutory damages award against defendants.

### B. Revenues Lost by Plaintiff

With respect to the second *Fitzgerald* factor (revenues lost by plaintiff), Streamlight contends it has lost revenue totaling approximately $380,000.   See Pl. Mem. at 15-16.   Based on the limited documents provided by defendant Gindi, plaintiff estimates that Streamlight lost 16,300 sales – 11,450 MICROSTREAM units retailing for about $15.99 and 4,850 PROTAC units retailing for approximate $40.57.   See id. at 16 (citing Gregory Decl. ¶¶ 4-5, 12). Streamlight concludes that its potential revenue on PROTAC units totals $196,864, while its revenue on MICROSTREAM units totals $183,000.   See id.   Plaintiff has also offered evidence to support its assumption that each sale of a counterfeit non-Streamlight flashlight displaced the sale of an authentic Streamlight light; that is, multiple Amazon reviews by customers who believed they were purchasing authentic Streamlight flashlights, only to learn that they had, in fact, received counterfeit lights.   See Ex. A (at p. 8) to Gregory Decl. (providing customer reviews for PROTAC 1L-1AA flashlights); Ex. B (at pp. 8-9) to Gregory Decl. (providing the same for MICROSTREAM lights).

Nevertheless, Streamlight neither pleads any facts nor proffers any evidence as to whether any purchasers of non-authentic Streamlight counterfeits on Amazon subsequently purchased authentic Streamlight flashlights after learning the initial purchases were counterfeit. If buyers who learned of the counterfeit nature of the flashlight obtained on Amazon later purchased authentic lights from Streamlight, or from a vendor such as Amazon that sells such

26

lights, then Streamlight did not lose revenue with respect to those purchasers.[13]   Therefore, the

lost revenues claimed by Streamlight, while a factor weighing in its favor, may overstate the

amount of plaintiff's losses.

## C.  Value of the Mark

Regarding the third factor (the value of plaintiff's mark), Streamlight has not provided

specific information relating to the monetary value of the Streamlight brand name.   Streamlight

has, however, established that its trademark is a valuable, well-established mark.   See Compl. ¶¶

10-12; Polo Ralph Lauren v. 3M Trading Co., No. 97 Civ. 4824(JSM)(MH), 1999 WL

33740332, at *6 (S.D.N.Y. Apr. 19, 1999) (courts can "infer from the well-known reputations of

most or all of the trademarks and the sea of advertising that presses them on the consciousness of

the buying public that they are indeed valuable").   Streamlight has gone to great lengths to

develop its reputation as a leader in the lighting tools industry, including providing durable and

trustworthy products to those who operate in dangerous environments such as fire departments,

police departments, the military, and others.   See Compl. ¶ 11.   Thus, the record is clear that

Streamlight possesses a highly valuable mark within its field.   This factor weighs heavily in

favor of plaintiff's demand for statutory damages.

## D.  Scale of Defendants' Infringement

The fourth *Fitzgerald* factor examines the scale of defendants' infringement.   Based on

the existing record, defendants' counterfeiting of Streamlight products was significant in scope,

as "Streamlight has *identified over 16,000* counterfeit goods, each bearing Streamlight's

---

[13] There is reason to believe that at least some customers received counterfeit lights from Amazon only to purchase authentic ones.   One Amazon customer wrote, in a review attached to plaintiff's Motion for Default Judgment, of receiving a counterfeit Streamlight MICROSTREAM light, being unable to return it, and ordering another.   See Ex. B. (at p. 8) to Gregory Decl.

registered marks on the counterfeit product and packaging."   Pl. Mem. at 17 (emphasis in original).   Furthermore, defendants used Amazon's online platform and its "virtually limitless number of customers" to sell its counterfeit Streamlight products.   See Compl. ¶¶ 22-30; Rolex Watch, U.S.A., Inc. v. Pharel, No. 09 CV 4810(RRM)(ALC), 2011 WL 1131401, at *5 (E.D.N.Y. Mar. 11, 2011) ("[U]se of three websites to sell counterfeit goods provides Defendants with a virtually limitless number of customers, which counsels in favor of higher damages . . . .") (citation and internal quotations omitted), adopted, 2011 WL 1130457 (E.D.N.Y. Mar. 28, 2011).   This factor also weighs heavily in favor of Streamlight and against defendants.

**E.  Whether Defendants' Conduct was Innocent or Willful**

With respect to the fifth factor (whether the conduct at issue was innocent or willful), defendants' conduct was willful.   An infringement is willful where the defendant had knowledge or recklessly disregarded the possibility that its actions constituted infringement. See 7-Eleven, 2018 WL 1521859, at *8.   As defendants defaulted, their infringement is *per se* willful.   See Chloe v. Zarafshan, No. 1:06-cv-03140-RJH-MHD, 2009 WL 2956827, at *7 (S.D.N.Y. Sept. 15, 2009).   Moreover, evidence of defendants' willfulness goes beyond the presumption arising from their default.   "Even in the absence of a default, courts in [this Circuit] have concluded that use of marks that are 'virtually identical' to the registered marks renders 'inescapable' the conclusion that the defendant's infringement and counterfeiting was intentional."   WowWee Grp. Ltd. v. Meirly, 18-CV-706 (AJN), 2019 WL 1375470, at *10 (S.D.N.Y. Mar. 27, 2019) (citations omitted).   This factor likewise weighs heavily in Streamlight's direction.

28

### F.  Whether Defendants Cooperated in Providing Particular Records

When assessing the sixth factor (the degree of cooperation by the defendants), courts typically construe this element against defendants who fail to answer or appear, thus preventing the exchange of comprehensive discovery.   See Innovation Ventures, LLC v. Ultimate One Distrib. Corp., No. 12-CV-5354 (KAM) (RLM), 2017 WL 10088143, at *7 (E.D.N.Y. Mar. 21, 2017).   In the case at hand, Streamlight failed to file an Answer or otherwise appear in the case. See Entry of Default.   Nevertheless, Streamlight was able to make contact with defendants, who "agreed to provide information to Streamlight only if Streamlight provided certain concessions and/or consideration," which Streamlight did.   Pl. Mem. at 18.   The information provided to Streamlight by defendant Gindi aided in its calculation of expenses saved and profits reaped by defendants as well as revenues lost by plaintiff; however, due to the limited nature of this information, Streamlight was unable to fully investigate its claims and damages and this Court is constrained in its factfinding capabilities.   This factor still weighs in favor of Streamlight, albeit not as persuasively as some of the other *Fitzgerald* factors.

### G.  Potential for Deterring Defendants and Others

Plaintiff argues that the seventh factor (deterrence) supports a statutory damages award of $1,000,000 per infringing mark, for a total of $7,000,000.   See Pl. Mem. at 12, 19; Prop. Ord. ¶ 6.   Plaintiff further notes that an award serving a punitive, deterrent function is "particularly important where, as here, the limited evidence available to Streamlight suggests that others are involved in the counterfeiting scheme."   Pl. Mem. at 19.   When looking at the deterrence prong of the *Fitzgerald* test, "[t]he Court is mindful of the need to send a signal to these defendants, as well as others, that they will pay a substantial price for willfully infringing on the intellectual property rights of others."   Telebrands Corp. v. HM Imp. USA Corp., No. 09-CV-3492

(ENV)(RLM), 2012 WL 3930405, at *9 (E.D.N.Y. July 26, 2012), adopted, 2012 WL 3957188 (E.D.N.Y. Sept. 10, 2012).   Where a defendant acted willfully, as is the case here, the "statutory award should incorporate not only a compensatory, but also a punitive component, to discourage further wrongdoing by the defendants and others."   All-Star Mktg. Grp., LLC v. Media Brands Co., 775 F.Supp.2d 613, 622 (S.D.N.Y. 2011) (collecting cases).   In particular, courts should award statutory damages to emphasize that the trademark laws and court proceedings are not mere incidental costs of doing business in the profitable counterfeit trade.   See Gucci Am. Inc. v. Tyrrell-Miller, 678 F.Supp.2d 117, 122-23 (S.D.N.Y. 2008).   And deterring further wrongdoing is especially pressing in this case, as plaintiff's Complaint alleges that defendants continue to market and sell counterfeit goods in the United States and elsewhere.   See Compl. ¶ 38.

Nevertheless, because this Court is recommending the grant of a permanent injunction, see supra, Part III, as well as a delivery-and-destruction order, see supra, Part IV, the need for high statutory damages as a specific deterrent is less pressing.   See WowWee Grp., 2019 WL 1375470, at *10 (noting that, "[o]n the other side of the balance, because the Court has approved a permanent injunction in this action, specific deterrence (factor 7) does not necessarily militate for a higher award").   Therefore, this factor weighs in favor of a statutory damage award, but not to the extent that plaintiff suggests.

## H. Calculating Statutory Damages to the Case at Hand

In short, all of the seven Fitzgerald factors, to varying degrees, favor a monetary award for Streamlight.   Nevertheless, the Court concludes that an award of statutory damages totaling $1,000,000 adequately incorporates the compensatory and punitive components of such awards; while the Court's recommendation is less than plaintiff's requested $7,000,000, see Pl. Mem. at

30

12, 19, the recommended sum is a significant one, and it approaches three times the lost revenue estimated by plaintiff ($380,000), see id. at 16.

Awards of statutory damages in trademark counterfeiting cases range from the tens of thousands of dollars to the millions.   See Unilever Supply Chain, 2011 WL 1113491, at *4 (comparing cases), adopted, 2011 WL 1099841 (E.D.N.Y. Mar. 24, 2011).   In Unilever, the court assessed a spectrum of Second Circuit awards in counterfeiting cases.   See id.   The court noted that "[a]t one end of the spectrum are cases in which the court has awarded the maximum amount of statutory damages . . . [;] [t]hese cases tend to feature widespread and extremely expensive infringements."   Id.   For instance, in Phillip Morris USA Inc. v. Marlboro Express, the court awarded maximum statutory damages where the defendants' counterfeiting operation involved millions of cigarettes valued at more than $4,773,790.   See No. CV-03-1161 (CPS), 2005 WL 2076921, at *6 (E.D.N.Y. Aug. 26, 2005).   At the other end of the spectrum are cases where the courts have awarded far less in statutory damages.   See Stark Carpet Corp. v. Stark Carpet & Flooring Installations, Corp., 954 F.Supp.2d 145, 155-56 (E.D.N.Y. 2013) (awarding statutory damages of $10,000 in a default judgment case).

Some judges have awarded a statutory sum without multiplying that amount by the number of trademarks infringed, see Tiffany (NJ) LLC v. Dong, No. 11 Civ. 2183(GBD)(FM), 2013 WL 4046380, at *6 (S.D.N.Y. Aug. 9, 2013) (collecting cases), whereas others issue awards on the basis of per-mark-per-type-of-goods, but well below the statutory maximum, see Gucci Am., Inc. v. MyReplicaHandbag.com, No. 07 CIV. 2438 (JGK), 2008 WL 512789, at *5 & n.3 (S.D.N.Y. Feb. 26, 2008) (collecting cases).

Plaintiff cites multiple cases in support of its requested statutory award of $1,000,000 per infringed mark.   See Pl. Mem. at 12-19.   Courts in many of these cases were unable to

approximate either the ill-gotten gains of the defendants or the approximate losses suffered by the plaintiffs.   Thus, these cases are not especially instructive, as plaintiff, in its motion papers, highlights both the estimated profits reaped by defendants and revenues lost by Streamlight. See id. at 14-15.   This Court is also concerned that an award of $1,000,000 per infringed mark would provide plaintiff with a windfall.   Traditionally, "[t]o the extent possible, statutory damages should be woven out of the same bolt of cloth as actual damages," Gucci Am., Inc. v. Duty Free Apparel, Ltd., 315 F.Supp.2d 511, 520 (S.D.N.Y. 2004) (citation and internal quotation omitted), amended in part on other grounds, 328 F.Supp.2d 439 (S.D.N.Y. 2004).

In a case similar to the one at hand and cited multiple times by plaintiff, Sara Lee Corp. v. Bags of New York, Inc., the court awarded statutory damages of $750,000 where the seizure of counterfeit goods disclosed an inventory of $230,000.   See 36 F.Supp.2d 161, 170 (S.D.N.Y. Jan. 28, 2009).   After noting that "purely compensatory relief would merit an award of $250,000 as a reasonable estimate of the ill-gotten gains of the defendants," the court in Sara Lee decided that the "high level of willfulness merits a trebling of the amount that would be appropriate as purely compensatory relief."[14]   Id.

Here, plaintiff estimates that defendants' profits totaled between $266,613.27 and $276,000, see Gregory Decl. ¶ 12, while Streamlight's losses total approximately $380,000, see id. ¶¶ 4-5, 12; Pl. Mem. at 15-16.   However, as this Court previously discussed, these numbers are inexact, due to the lack of discovery in this case.   An award of this magnitude also fails to

---

[14] Pursuant to 15 U.S.C. § 1117(b), a prevailing Lanham Act plaintiff who opts to recover actual damages is entitled to the trebling of the defendants' profits or plaintiff's damages, absent extenuating circumstances.   See Louis Vuitton S.A. v. Spencer Handbags Corp., 765 F.2d 966, 970-71 (2d Cir. 1985).

account for other factors, including harm to the plaintiff's especially valuable reputation,[15] defendants' failure to fully cooperate, defendants' willful state of mind, and the need to deter defendants as well as possible future infringers.    Therefore, this Court, in applying the approach taken in Sara Lee, and weighing the aforementioned considerations, including this Court's desire to prevent plaintiff from obtaining a windfall and the legislative goals of the Lanham Act's actual and statutory damages provisions, respectfully recommends the District Court enter a statutory damages award totaling $1,000,000.[16]

## VI.    Plaintiff's Request for an Accounting

Plaintiff additionally requests that the Court order defendants to file an accounting "specifying the full details of its sales of infringing and/or counterfeit goods, including but not limited to (a) the quantity of goods sold worldwide, by month/year and country, which bear or bore a mark consisting of, or substantially similar to, any Streamlight marks; (b) the specific types and models of the goods sold; (c) all known sources and manufacturers of such goods, including copies of all United States Customs and related import documentation; (d) gross revenue and profits for all such sales, by month/year and country; and (e) identification of all

---

[15] "Profits can also be lost indirectly as a result of the harm that the plaintiff's reputation may suffer when a counterfeiter misleads consumers into believing that the counterfeiter's own goods or services are attributable to the plaintiff."    Century 21 Real Estate LLC v. Bercosa Corp., 666 F.Supp.2d 274, 294 (E.D.N.Y. 2009).

[16] This sum is in line with prior awards in the Second Circuit.    In cases involving the infringement of multiple trademarks, various courts in this Circuit have ordered aggregate awards that were less than the statutory maximum for a single infringed trademark.    See, e.g., Rolex Watch U.S.A., Inc. v. Aulov, CV 10-3547 (DLI) (VVP), 2011 WL 13295372, at *5 (E.D.N.Y. July 15, 2011) (collecting cases and recommending "a total of $1,000,000 in statutory damages" for defendant's infringement of eleven trademarks); Pharel, 2011 WL 1131401, at *6 ($1,000,000 statutory damages award where defendant willfully infringed eight trademarks).

Streamlight marks used in connection with such sales, by country."   Compl., *ad damnum* clause ¶ 5.

An accounting is a remedy available under Section 35(a) the Lanham Act, see 15 U.S.C. § 1117(a), which allows a plaintiff, "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) costs of this action."   15 U.S.C. § 1117(a).   Traditionally, courts assessing trademark infringement and unfair competition claims under that section will order an accounting of a defendant's profits as a means to determine the extent of the plaintiff's actual damages, whether the defendant has been unjustly enriched, and/or the need to deter a willful infringer from doing so again.   See generally George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1537 (2d Cir.); see also Banff, Ltd. v. Colberts, Inc., 996 F.2d 33, 35 (2d Cir. 1993).

Plaintiff argues that an accounting is necessary for deterrence purposes; however, its request is deficient for myriad reasons.   First, plaintiff has not satisfied the Court that an accounting is an available and appropriate remedy where, as here, the plaintiff is not seeking actual damages under Section 35(a) of the Lanham Act (the provision held to authorize a court-ordered accounting), but rather is requesting an award of statutory damages under Section 35 (c), 15 U.S.C. § 1117(c), which does not require a showing of the defendant's profits.   Plaintiff argues that it is "well settled in [the Second Circuit] that when an infringer acts with willful deception, an accounting for profits may be based upon unjust enrichment, damages, or *deterrence of a willful infringer*."   Pl. Supp. Mem. at 3 (emphasis in original).   But the cases cited by plaintiff do not appear especially persuasive, as they involved court-ordered accountings to ascertain the profits to be disgorged by the wrongdoer – a form of actual damages not being

34

sought by plaintiff in the case at hand.[17]    See generally Merck Eprova AG v. Gnosis S.p.A., 760 F.3d 247, 261-62 (2d Cir. 2014).

Second, even if an accounting, as requested, is statutorily authorized under 15 U.S.C. § 1117(c), plaintiff's deterrence rational is unavailing.    Plaintiff argues that an accounting is needed "to help ensure the conduct that necessitated this lawsuit is not repeated."    Pl. Supp. Mem. at 4.    But the need for deterrence is adequately addressed by this Court's recommendation that the District Court order (i) injunctive relief, (ii) an award of statutory damages, (iii) a delivery-and-destruction order, and (iv) an award of attorneys' fees and costs.[18]    Plaintiff also fails to demonstrate that the scope of the accounting, as requested, is appropriate.    Therefore, this Court concludes that an accounting is not warranted in this case, and respectfully recommends the District Court deny plaintiff's request.

## VII.    Plaintiff's Request for Attorneys' Fees & Costs

### A.  Applicable Legal Standard

Streamlight also seeks to recover attorneys' fees and costs.    See Compl., *ad damnum* clause ¶ 13; Pl. Mem. at 19-20; Pl. Supp. Mem. at 2.    Section 35(a) of the Lanham Act grants courts discretion to award reasonable attorneys' fees in "exceptional" trademark infringement

---

[17] In Century 21 Real Estate, 666 F.Supp.2d at 298, cited by plaintiff, the court entered a default judgment awarding the plaintiff, *inter alia*, $309,585.32 in contractual damages, $5,000 in Lanham Act statutory damages, and a permanent injunction; in addition, in order to ascertain whether plaintiff had "lost more revenue than the court award[ed] as damages on the contract claims," the court directed the defendants to cooperate in an audit to which the plaintiff was entitled under the franchise agreements breached by the defendants.    Id. at 298.    In passing, the court observed in dictum that the plaintiff was entitled to an audit "[u]nder the Lanham Act," but did not address the fact that the plaintiff was pursuing statutory, rather than actual, damages under the Act.    This Court has found no decision in which a plaintiff seeking statutory damages under Section 35(c) was awarded an accounting based solely on the remedial provision of the Lanham Act.

[18] Attorneys' fees and costs are addressed in Part VIII of this opinion.

cases.   See 15 U.S.C. § 1117(a).   That same provision also allows for the recovery of costs subject to the requirements of 15 U.S.C. § 1114 and the principles of equity.   Id.

Traditionally, the Second Circuit had deemed a case "exceptional" only if the prevailing party in a trademark infringement case put forth evidence of "fraud or bad faith."   See Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd., 996 F.2d 1366, 1383 (2d Cir. 1993).   However, in a patent case decided in 2014, the Supreme Court embraced a more flexible standard, holding that an "exceptional case" is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."   Omega SA v. 375 Canal LLC, 12 Civ. 6979 (PAC), 2019 WL 2442434, at *3 (S.D.N.Y. June 12, 2019) (quoting Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545 (2014); see Sleepy's LLC v. Select Comfort Wholesale Corp., 909 F.3d 519, 531 (2d Cir. 2018) (adopting Octane Fitness in Lanham Act cases).   In applying the Octane Fitness standard, district courts enjoy wide latitude as they engage in "case-by-case exercise of their discretion, considering the totality of the circumstances."   4 Pillar Dynasty LLC v. New York & Co., Inc., 933 F.3d 202, 215 (2d Cir. 2019) (citation and quotation marks omitted).   Courts may consider relevant non-exhaustive factors including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."   Octane Fitness, LLC, 572 U.S. at 554 n.6 (quoting Fogerty v. Fantasy, Inc., 510 U.S. 517, 534 n.19 (1994)).[19]

---

[19] In its October 31, 2018 Memorandum requesting attorney's fees and costs, see Pl. Mem. at 19-20, and its June 7, 2019 Supplemental Memorandum, see Pl. Supp. Mem. at 2, Streamlight fails to address whether plaintiff is entitled to recover fees under the applicable Octane Fitness standard.   Instead, plaintiff recites the pre-Octane Fitness standard that "willfulness on the part of the Defendants is key to determining a party's right to attorney's fees."   Pl. Mem. at 19.

Both before and after *Octane Fitness*, courts in the Second Circuit have regularly awarded attorneys' fees against defaulting defendants under Section 35(a).   See, e.g., Innovation Ventures, 176 F.Supp.3d at 164 (noting that "[c]ourts have also granted attorneys' fees to prevailing Lanham Act plaintiffs where the defendant defaulted"); Beastie Boys v. Monster Energy Co., 112 F.Supp.3d 31, 46-47 (S.D.N.Y. 2015) (referring to the *Octane Fitness* standard and stating that the case at hand was not "exceptional," in part, because the defendant had not defaulted); see also Capital One, 2019 WL 1299266, at *7 (concluding that plaintiff was entitled to a fee award, as "[a] defendant in default is deemed to be a willful infringer of the Lanham Act") (citing cases); Chloe, 2009 WL 2956827, at *7.

Nevertheless, to the extent that a party's default is no longer determinative of willfulness with respect to attorneys' fees, this Court must assess additional factors to determine whether this case qualifies as "exceptional."   After considering the totality of the circumstances and applying the *Octane Fitness* considerations, this case qualifies as "exceptional."   First, the substantive strength of plaintiff's litigating position has been extremely strong, as demonstrated by a side-by-side comparison of the Streamlight and non-Streamlight products.   See Compl. ¶¶ 1, 24-25, 27.   Streamlight also details defendants' extensive use of plaintiff's marks, as defendants sold over 16,300 MICROSTREAM and PROTAC 1L-1AA flashlights.   See Next Realty, LLC v. Next Real Estate Partners LLC, 16-CV-6327 (JS) (GRB), 2019 WL 1757781, at *5 (E.D.N.Y. Mar. 11, 2019) ("In this case, the evidence of defendants' extensive use of plaintiff's mark, which continued after the commencement of litigation, combined with the default, renders this an exceptional case warranting an award of fees."), adopted, 2019 WL 1758447 (E.D.N.Y. Mar. 26, 2019).   Second, defendants frustrated the litigation process by failing to appear in this case or, at any point, respond to the allegations listed in the Complaint.

<u>See</u> Entry of Default.   As a result, plaintiff could not obtain meaningful discovery, including

discovery related to damages.   Defendants did provide plaintiff with certain documents relating

to their purchases and sales of non-Streamlight products; however, as discussed above, these

documents were limited in scope and were not provided until Streamlight agreed to certain

concessions.   <u>See</u> Gregory Decl. ¶ 11.   Nor did defendants respond to plaintiffs motion for

default judgment, although invited to do so.   <u>See</u> 5/22/19 Order at 2.   Lastly, an award of

attorneys' fees and costs is appropriate here as it furthers the goals of the Lanham Act, including

deterrence of similarly willful conduct both by defendants and other possible infringers.

### B.  Plaintiffs' Rates and Hours Billed

In considering an application for attorneys' fees, the Court must next determine the

presumptively reasonable fee.   <u>See</u> <u>Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty.</u>

<u>of Albany</u>, 522 F.2d 182, 183-84 (2d Cir. 2008).   The presumptively reasonable fee – or

loadstar[20]– is essentially "'what a reasonable, paying client would be willing to pay,' given that

such a party wishes 'to spend the minimum necessary to litigate the case effectively.'"

<u>Simmons v. New York City Transit Auth.</u>, 575 F.3d 170, 174 (2d. Cir. 2009) (quoting <u>Arbor</u>

<u>Hill</u>, 493 F.3d at 112, 118).

Courts can and should exercise broad discretion in determining a reasonable fee award.

<u>See</u> <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 437 (1983) ("The court necessarily has discretion in

making this equitable judgment."); <u>Arbor Hill</u>, 522 F.3d at 190 (referencing the court's

"considerable discretion").   This method for determining reasonable attorneys' fees in this

Circuit is based on a number of factors, such as the labor and skill required, the difficulty of the

---

[20] The loadstar is the product of the number of hours reasonable expended on the litigation and a reasonable hourly rate.   <u>See</u> <u>Arbor Hill</u>, 522 F.3d at 183.

issues, the attorney's customary hourly rate, the experience, reputation, and ability of the

attorney, and awards in similar cases.   See Arbor Hill, 522 F.3d at 186 n.3, 190.   In particular,

when assessing an attorney's requested hourly rate, courts typically consider other rates awarded

in the district in which the reviewing court sits.   This is known as the "forum rule."   See

Simmons, 575 F.3d at 174-75 (recounting the history of the forum rule); see also Arbor Hill, 522

F.3d at 191 ("We presume, however, that a reasonable, paying client would in most cases hire

counsel from within his district, or at least counsel whose rates are consistent with those charged

locally.").[21]

Once the Court determines the reasonable hourly rate, it must multiple that rate by the

number of hours reasonable expended, in order to determine the presumptively reasonable fee.

See Arbor Hill, 522 F.3d at 190.   With very limited exceptions, a party seeking an award of

attorneys' fees must support its request with contemporaneous time records that show "for each

attorney, the date, the hours expended, and the nature of the work done."   N.Y. State Ass'n For

Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983).   The Court must then

review these time records and the hours an attorney billed in order to determine the

reasonableness of such and, in doing so, should examine the value of the work product and

"'exclude excessive, redundant, or otherwise unnecessary hours.'"   Concrete Flotation Sys., Inc.

v. Tadco Constr. Corp., No. 07-CV-319 (ARR)(VVP), 2010 WL 2539771, at *5 (E.D.N.Y. Mar.

15, 2010) (quoting Quaratino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 2009)), adopted, 2010

WL 2539661 (E.D.N.Y. June 17, 2010).   "[A] fee award should be based on scrutiny of the

---

[21] In order to overcome the forum rule's presumption, "a litigant must persuasively establish that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result."   Simmons, 575 F.3d at 175.

unique circumstances of each case . . . ."   McDaniel v. Cnty. of Schenectady, 595 F.3d 411, 426

(2d Cir. 2010) (internal quotations and citations omitted).

### C. Reasonable Hourly Rate

Here, plaintiff seeks an award of $93,437.55 for attorneys' fees.   See Rillotta Decl. ¶¶ 7,

13-14; Ex. A to Rillotta Decl.   Multiple attorneys and paralegals with the firm of Drinker Biddle

& Reath LLP ("the Firm") worked on the case.   See Rillotta Decl. ¶¶ 3, 9-11.   Partner Joseph

Rillotta has been practicing law for over 15 years, and seeks an hourly rate of $725.   See id. ¶ 3.

Partner Brian A. Coleman, who has been practicing law for approximately 20 years, specializes

in trademark litigation, and has handled trademark litigation matters in courts nationwide, bills at

$650 per hour.   See id. ¶ 9.   Attorney Thuy T. Bui has been practicing law for more than 20

years, and bills at $585 per hour.   See id. ¶ 10.   Six "other attorneys and paralegals" worked on

the case, see id. ¶ 11, but plaintiff has not described their backgrounds and experience, or even

clarified who is an attorney and who is a paralegal.   Based on the information available on the

Firm's website, and having performed its own calculations in connection with the billable

records provided to this Court, see Ex. A to Rillotta Decl., the Court has identified the six other

individuals and their billable rates as follows:

| Name | Rate |
|---|---|
| M. Sosnowsky (attorney - partner) | $600 |
| KM Moseley (attorney - associate) | $380 |
| CJ Pierce (attorney - partner) | $760 |
| BM Stamm (paralegal) | $295 |
| M Indych (attorney - counsel) | $575 |
| B. Diaz (paralegal) | $280 |

The hourly rates sought by plaintiff far exceed the presumptively reasonable rates that

courts approve in similar circumstances in the Eastern District of New York.   For instance, rates

in intellectual property cases in this District generally range from $300 to $450 for partners, $200 to $300 for senior associates, $100 to $200 for junior associates, and $70 to $100 for paralegal assistants. See, e.g., JMC Rest. Holdings, LLC v. Pevida, 14 Civ. 6157 (WFK) (VMS), 2018 WL 4189730, at *3 (E.D.N.Y. June 20, 2018), adopted, 2019 WL 4126637 (E.D.N.Y. Aug. 29, 2019); see also Zuffa, LLC v. South Beach Saloon, Inc., CV 15-6355 (ADS) (AKT), 2019 WL 1322620, at *6 (E.D.N.Y. Mar. 6, 2019), adopted, 2019 WL 1317568 (E.D.N.Y. Mar. 22, 2019); Mitchell Grp. USA LLC v. Udeh, No. 14-CV-5745 (DLI) (JO), 2017 WL 9487193, at *10 (E.D.N.Y. Mar. 8, 2017), adopted, 2017 WL 3208532 (E.D.N.Y. July 28, 2017).   Higher rates have been awarded in certain intellectual property cases where the courts were provided with evidence of the qualifications and experience of each of the attorneys.   See generally Protection One Alarm Monitoring, Inc. v. Exec. Protection One Sec. Serv., LLC, 553 F.Supp.2d 201, 208-09 (E.D.N.Y. 2008).   "Where parties fail to provide that information, courts use their discretion to award fees at a lower rate than requested."   Mister Softee, Inc. v. Konstantakakos, 15-CV-4770 (SJ) (SMG), 2016 WL 11445964, at *5 (E.D.N.Y. June 27, 2016) (citation omitted), adopted, 2016 WL 4250314 (E.D.N.Y. Aug. 11, 2016).   Hence, when a party fails to provide information to support the hourly rate of an associate, courts may reduce the hourly rate to the lowest associate rate in the range.   See Lu Nan Fan v. Jenny & Richard's Inc., 17-CV-6963 (WFK), 2019 WL 1549033, at *14 (E.D.N.Y. Feb. 22, 2019), adopted, 2019 WL 1547256 (Feb. 22, 2019).   Here, nothing in the record warrants a fee award at rates higher than those traditionally granted in this District; in fact, given defendants' default, the case was not particularly complex.

Plaintiff's counsel has made a brief showing of the professional experience of three (out of seven total) attorneys who worked on this case: Mr. Rillotta, Mr. Coleman, and Ms. Bui.   See

Rillotta Decl. ¶¶ 3, 9-10.   For only one of these individuals (Mr. Coleman) did plaintiff offer evidence of a particular expertise in trademark litigation.   Id. ¶ 9.   Because plaintiff's counsel failed to provide the requisite level of detail regarding the experience and qualifications of the attorneys who worked on the case, this Court respectfully recommends awarding fees based on the following amounts: $450 per hour for Mr. Coleman, $400 per hour for Mr. Rillotta, $325 per hour for Ms. Bui, $300 per hour for partners Sosnowsky and Pierce, $300 for counsel Indych, $200 per hour for associate Moseley, and $100 for paralegals Stamm and Diaz.

### D.  Reasonable Number of Hours

Turning to the total hours expended by plaintiff's counsel, the Firm seeks reimbursement for 175.70 hours of work, conducted between January 19, 2018 and October 30, 2018.   Ex. A to Rillotta Decl.   Although the billing records provided to the Court show the individual time entries of each staff member who worked on the case, plaintiff failed to provide an individual-by-individual breakdown of the *total* hours worked by each attorney and paralegal.   The Court therefore took it upon itself to determine the total hours worked based on the proffered time-records, as is displayed on the following chart:[22]

| Name | Hours Worked |
|---|---:|
| BA Coleman | 51.6 |
| JA Rillotta | 56.6 |
| TT Bui | 21.7 |
| M. Sosnowsky | 0.4 |
| KM Moseley | 13.8 |
| CJ Pierce | 0.8 |
| BM Stamm | 23.0 |
| M Indych | 4.9 |
| B. Diaz | 2.9 |
| | **175.7** |

---

[22] "Inadequate documentation is grounds for reduction of a fee award."   Century 21 Real Estate, 666 F.Supp.2d at 299.

Based on the entries provided to the Court, the number of hours claimed appears excessive.   "Where time entries are vague, duplicative, or otherwise inadequate, a court may make an across-the-board reduction, or percentage cut, in the amount of hours."   Mister Softee, 2016 WL 11445964, at *6 (citation and internal quotation marks omitted).   The hours claimed may not pass muster if a disproportionate amount of time was billed by the more senior attorneys, compared to junior associates and paralegals.   See Mitchell Grp., 2017 WL 9487193, at *11.   Moreover, while "block billing" is not prohibited, a "substantial amount of block billing in . . . fee requests renders it difficult to determine whether, and/or the extent to which the work done . . . is duplicative or unnecessary."   Kawan Food Mfg. SDN BHD v. Bengal Sea Foods USA Canada, Inc., No. 06-CV-5430(ERK)(RER), 2008 WL 5483106, at *4 (E.D.N.Y. Dec. 1, 2008) (citation omitted).

Here, two partners at the firm, Coleman and Rillotta, performed 108.2 hours of work (approximately 61 percent of the total work performed on the case).   While this percentage may be appropriate in certain cases, no explanation is provided as to why two senior partners conducted the vast majority of the work.   Moreover, some of the billing entries provided to the Court, see Ex. A to Rillotta Decl., consist of block entries that fail to distinguish the time spent on individual tasks.   Plaintiff does not explain why 175.7 hours of work was necessary in a case in which defendants failed to appear.[23]   Accordingly, the Court recommends an across-the-board 20 percent reduction in the hours expended by plaintiff's counsel.   With the adjusted rates discussed above, and applying a 20 percent across-the-board reduction, the Court respectfully recommends an award of $48,074 in attorneys' fees, as summarized by the following table:

---

[23] According to plaintiff, those time charges do *not* include the time expended in pre-suit investigation or third-party discovery.   See Rillotta Decl. ¶ 13.

43

| Name | Revised Rate | Reasonable Hours | Total |
|---|---|---|---|
| BA Coleman (attorney – partner) | $450 | 41.28 | $18,576 |
| JA Rillotta (attorney – partner) | $400 | 45.28 | $18,112 |
| TT Bui (attorney – counsel) | $325 | 17.36 | $5,642 |
| M. Sosnowsky (attorney - partner) | $300 | 0.32 | $96 |
| KM Moseley (attorney - associate) | $200 | 11.04 | $2,208 |
| CJ Pierce (attorney - partner) | $300 | 0.64 | $192 |
| BM Stamm (paralegal) | $100 | 18.40 | $1,840 |
| M Indych (attorney - counsel) | $300 | 3.92 | $1,176 |
| B. Diaz (paralegal) | $100 | 2.32 | $232 |
| | | | **$48,074** |

**E.  Costs**

A case need not need to qualify as extraordinary in order for the prevailing party to recover its costs under the Lanham Act.   See Coty Inc. v. Excell Brands, LLC, 277 F.Supp.3d 425, 470 (S.D.N.Y. 2017).   Instead, the statute provides that a court may grant an award of costs subject to the "principles of equity."   See 15 U.S.C. § 1117(a).   Courts typically award costs to the prevailing party or parties in Lanham Act cases.   See Coty Inc., 277 F.Supp.3d at 471 (citation omitted).   Here, plaintiff requests $3,221.96 in costs.   See Ex. A to Rillotta Decl. These costs generally consist of filing and service fees, research fees, clerical costs, and related expenses.   These are routine costs typically awarded when a defendant defaults.   See Louis Vuitton Malletier v. Artex Creative Int'l Corp., 687 F.Supp.2d 347, 364-65 (S.D.N.Y. 2009). This Court finds find that such costs are reasonable.

## CONCLUSION

For the foregoing reasons, this Court respectfully recommends that plaintiff's motion for default judgment be granted in substantial part and denied in part.   More specifically, the District Court should enter default judgment against defendants Gindi and Bridgewater, jointly and severally, on Streamlight's trademark infringement and trademark counterfeiting claims under the Lanham Act, Streamlight's unfair competition and false designation of origin claim under the same, and Streamlight's unfair competition claim under New York common law.[24]   In addition, it is the recommendation of this Court that Streamlight be granted its requested permanent injunctive relief, a delivery-and-destruction order, $1,000,000 in statutory damages, attorneys' fees totaling $48,074 and costs totaling $3,221.96; the Court further recommends that Streamlight's request for an accounting be denied.

Any objections to this Report and Recommendation must be filed with the Honorable Nina Gershon on or before October 18, 2019.   Failure to file objections in a timely manner may waive a right to appeal the District Court order.   See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72.

The Clerk is respectfully requested to docket this Report and Recommendation into the ECF court file and to FedEx copies to defendants at the following addresses, respectively:

Jacob Gindi
1236 East 8th Street
Brooklyn, NY 11230


Jacob Gindi
1002 Ocean Parkway
Brooklyn, NY 11230

---

[24] As plaintiff is not pursuing its two New York statutory claims, or its claims against John Doe defendants, those claims should be dismissed.

Bridgewater Technologies LLC
1236 East 8th Street
Brooklyn, NY 11230


Bridgewater Technologies LLC
1002 Ocean Parkway
Brooklyn, NY 11230


**SO ORDERED.**

**Dated: Brooklyn, New York**
**October 1, 2019**

/s/        **Roanne L. Mann**
**ROANNE L. MANN**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

46